STATE OF CONNECTICUT : <br>
: <br>
: ss: New Haven, Connecticut <br>
: <br>
COUNTY OF NEW HAVEN : November 24, 2020

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

I, Anabela F. Sharp, a Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

**BACKGROUND OF AFFIANT**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2005. My experience as an FBI Special Agent has included the investigation of international terrorism matters and criminal crimes. Since March of 2017, I have been assigned to investigate Violent Crimes Against Children and have participated in several investigations involving child exploitation, trafficking of child pornography, and online enticement of minors. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, and various other criminal law procedures. I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, and I am authorized by the Attorney General to request search and arrest warrants.

2. I, along with members of the Waterbury Police Department ("Waterbury PD") in Waterbury, Connecticut, am currently investigating Michael Schmeer ("SCHMEER"), a 51-year old male born in 1969, for possession of child pornography, in violation of 18 U.S.C. §

2252A(a)(5)(B) and receipt and distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) (the "TARGET OFFENSES").

3. This affidavit is being submitted in support of an Application for a Search Warrant to search and seize the contents of the following electronic devices, as more specifically described in Attachment A (collectively, the "TARGET DEVICES"), which the Waterbury Police Department seized from SCHMEER's residence in Waterbury, Connecticut on or about August 12, 2020:

a. One Dell Latitude E5450 S/N: 9SZGS32, (hereinafter "**Target Device 1**");

b. One 3TB SATA III, Model: WL3000GSA6472, (hereinafter "**Target Device 2**");

c. One Seagate Desktop HDD, S/N: 24Z6H1MS, (hereinafter "**Target Device 3**");

d. One Acer Aspire Laptop E15 S/N: NXGRYAA0019070E0087600, (hereinafter "**Target Device 4**");

e. One M11H Model Tablet with red case, (hereinafter "**Target Device 5**");

f. Four USB Drives and one DVD-R hand written label "Legacy of Love" , (hereinafter "**Target Device 6**");

g. One Seagate Barracuda 1000GB, S/N: W1D49AEC, (hereinafter "**Target Device 7**");

h. One Seagate Pipeline HD 500 GB, S/N: 6VV8ZHOY, (hereinafter "**Target Device 8**");

i. One Hitachi 2TB, S/N: YAK00095V, (hereinafter "**Target Device 9**");

j. One WD VelociRaptor 150 GB, S/N: WXL1C10C9382, (hereinafter "**Target Device 10**");

k. One Seagate drive S/N: 4NF1Y8LT, (hereinafter "**Target Device 11**");

l. One Western Digital S/N: WMAM9CWS7022, (hereinafter "**Target Device 12**");

m. One Seagate drive S/N: 3J82LTZN, (hereinafter "**Target Device 13**");

        n.        One Seagate drive S/N: 5JS2R077, (hereinafter "**Target Device 14**");

    4.    Based on the information set forth in this affidavit, I believe there is probable cause to believe that the TARGET DEVICES contain items that constitute instrumentalities, fruits, and evidence of the TARGET OFFENSES as specified in Attachment B, which is incorporated herein by reference.

    5.    The statements contained in this affidavit are based in part on information provided by other members of local, state, and federal law enforcement, my own investigation to include personal observations, documents and other investigative materials which I have reviewed, as well my training and experience as a Special Agent with the FBI. Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES are located within the TARGET DEVICES, as more fully described in Attachment A, which is incorporated herein by reference.

## RELEVANT STATUTE

    6.    18 U.S.C. § 2252A(a)(5)(B) prohibits "any person who knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer."

7. 18 U.S.C. § 2252A(a)(2) prohibits "any person who . . . knowingly receives or distributes . . . (A) any child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or (B) any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

**DEFINITIONS**

8. The following definitions apply to this Affidavit:

a. "Minor," as used herein, is defined by 18 U.S.C. § 2256(1) to mean any person under the age of eighteen years.

b. "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), and also includes any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. 18 U.S.C. § 2256(8).

c. "Visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data

which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

        d.    "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2)(A).

## BACKGROUND OF BITTORRENT

9. BitTorrent is a peer-to-peer ("P2P") program that allows users to share files. Internet capable devices linked together through the Internet using this software form a network that allows for the sharing of digital files among users on the network. To begin, a user first obtains the P2P software, which can be downloaded from the Internet. Based on my training and experience, I know that BitTorrent programs are readily available on the Internet and are generally free to download. BitTorrent can be accessed from Internet connected devices, such as computers, tablets and smartphones.

10. Torrent files are typically found as the result of keyword searches on internet sites (i.e. Torrent websites) that host or link to them. The results of a keyword search are displayed to the user. The website does not contain the files being shared. Instead, it contains .torrent file(s). The user selects the .torrent file(s) from the results for download. The .torrent file(s) contain instructions on how a user can download the file(s) referenced in the Torrent. In addition, a torrent file holds the descriptive information about the files that are being downloaded such as names and sizes in addition to other metadata. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) sharing the actual files (not the

torrent file but the actual files referenced in the .torrent file using any BitTorrent client.)

11.     For example, a person interested in obtaining child pornographic images would open the BitTorrent website on his/her device and conduct a keyword search for files using a term such as "preteen sex." The results of the search are returned to the user's device and displayed on the torrent site. The user selects a .torrent from the results displayed with the file(s) he/she wants to download. Torrent files may be referenced by their "infohash," which uniquely identifies the torrent based on the file(s) associated with the torrent file.

12.     Once the .torrent file is downloaded, it is used by a BitTorrent program which the user had previously installed. The .torrent file is the set of instructions the program needs to find the files referenced in the .torrent file. The file(s) is downloaded directly from the computer or computers sharing the file. The downloaded file(s) is stored in the area previously designated by the user and/or the software. The downloaded file will remain until moved or deleted.

13.     One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading an image file may actually receive parts of the image from multiple computers. The advantage of this is that it speeds up the time it takes to download the file.

14.     A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address is unique to a particular device during an online session. The IP address provides a unique location, making it possible for data to be transferred between devices.

15.     The computer running the file sharing application, in this case a BitTorrent application, has an IP address assigned to it while it is on the internet. BitTorrent users are able to see the IP address of any device sharing files to them or receiving files from them. Investigators

log the IP address which has sent them files or information regarding files being shared. Investigators can then search public records that are available on the internet to determine the internet service provider who has assigned that IP address. Based upon the IP address assigned to the computer sharing files, subscriber information can be obtained from the internet service provider.

16. Based on my training and experience, I know that P2P networks, such as BitTorrent, are frequently used in the trading and trafficking of child pornography. BitTorrent software allows a user to download (i.e. receive) files from other users on the network and share (i.e. distribute) files from their device(s) with other BitTorrent users.

**BACKGROUND OF THE INVESTIGATION**

17. Beginning on or about October 25, 2019, Detective Mark Conway of the Watertown Police Department, and a member of the Connecticut Internet Crimes Against Children's Taskforce, used a BitTorrent application to conduct an online investigation for individuals possessing and distributing Child Sexual Abuse Material (CSAM) also known as child pornography.

18. The investigation led to the discovery of a torrent file with an infohash that ended with the following five digits: 96c66.[1] Det. Conway reviewed ten video files associated with the infohash, most of which had common child pornography names such as "–"7yo backyard fuck & pedo ".. At least seven of those video files appear to contain child pornography. For example, one of the videos is approximately four minutes long and is of an adult male inserting his penis

1 In an effort to reduce further distribution of the images contained in this infohash, the full infohash is not disclosed in this affidavit. However, the full infohash is known to your affiant. Similarly I only included partial file names throughout the Affidavit, but the full file names are known to your affiant.

and tongue into the vagina of a girl who appears to be approximately eight years old.

19. Of the seven videos depicting child pornography, two of the videos depict victims that were previously identified in other investigations and are included in a database of known minor victims that is maintained by the National Center for Missing and Exploited Children ("NCMEC").

20. All of the video files were downloaded from a direct connection to the computer network at IP address 32.214.245.118.

21. A check of publicly available records revealed that IP address 32.214.245.118 was registered to internet service provider Frontier Communications.

22. Between October 25, 2019 through December 21, 2019, Det. Conway, using a law enforcement computer, directly connected to a device at IP address 32.214.245.118 approximately 300 times and downloaded approximately 2000 files. Det. Conway reviewed hundreds of these files and confirmed that they contained child pornography. The victims include infant, toddler and prepubescent children. Most depict sexual acts perpetrated on the minor victims and some depict the minors tied up during the sexual abuse.

23. During his investigation, Det. Conway learned that Connecticut State Trooper Jonathon Carreiro of the Connecticut State Police Computer Crimes Unit also had an open child pornography investigation into IP address 32.215.245.118. Trooper Carrerio reported downloading three specific video files from IP address 32.214.245.118 which appeared to contain child pornography. Det. Conway also downloaded these files and confirmed that they were child pornography.

24. Trooper Carreiro obtained an Ex Parte order to disclose records with Frontier Communications for IP address 32.214.245.118 from the date and time range of 10/24/19 at 1449

hours EDT to 11/12/19 at 1613 hours EST. Trooper Carrerio also requested subscriber information for the timeframe 11/12/19 to 11/24/19.

25. Trooper Carrerio transferred his case to Det. Conway and provided the Ex Parte application and the return from Frontier Communications. Frontier Communications reported that the subscriber[2] of IP address 32.214.245.118 is registered to Brenda Schmeer to an address on Atwood Avenue, Waterbury, with a telephone number of 203-575-0494. The length of service was from 3/19/10 to present and the type of service was residential internet and telephone. The email address was Brenda.schmeer@frontier.com.

26. On or about June 05, 2020, Det. Conway provided Det. Ricardo Velez of the Waterbury Police Department with a Watertown Police Western Digital 320GB hard drive for transfer to the Waterbury Police containing the downloaded files and associated documents related to this case.

27. Det. Velez viewed 81 folders downloaded from IP address 32.214.245.118 by Det. Conway between the dates of 10/25/19 to 12/21/19. Each folder contained several videos depicting child pornography. Some titles read, "6Yo - Bedtime Rape" , "8Yo Masturbate" and "8Yo Boy Fucks 6Yo Girl".

28. Det. Velez confirmed through an online database that Brenda Schmeer was residing at an address on Atwood Avenue in Waterbury, Connecticut from at least the beginning of the relevant time period (10/25/19) and continued to reside at this address at this time. Waterbury

---

2 Frontier provided two sessions for the subscriber 10/24/19 through 10/31/19 and 11/7/19 through 11/14/19. On or about March 02, 2020, Det. Conway spoke to Frontier Legal regarding the subscriber information provided. Frontier Legal explained that they did not search 10/24/19 through 11/12/19, which was Det. Carrerio's requested date range. Frontier Legal advised they searched around those two dates, which is the reason that they provided information for two separate sessions. This left a gap of service in between the requested date range, however, Frontier Legal also advised that the same user was within the gap between the sessions. Det. Conway also confirmed that child pornography was downloaded from the named subscriber's account during both sessions.

Police records and open source searches listed Michael Schmeer as an additional resident at the residence. City of Waterbury records on the residence showed that the house was purchased on 10/21/1991 by "SCHMEER MICHAEL J & BRENDA M SURV."

29. Based on the above information, Det. Conway and Det. Velez applied for a search and seizure warrant for the residence. Included in the affidavit attached to the search warrant was the request that a search and seizure warrant be issued and that a complete digital forensic examination be performed on the items seized. The search warrant was executed on August 12, 2020. SCHMEER was present at the residence during the execution of the warrant. During the course of the search, SCHMEER was interviewed. The interview was recorded.

30. Det. Conway provided an advisement of rights form which SCHMEER signed. SCHMEER stated that he downloaded and is currently in possession child sexual abuse material or child pornography. SCHMEER explained that he saved child pornography to an internal hard drive attached to a dock plugged into the laptop. When he downloads child pornography, he saves it to a folder named "Dad's Stuff" on an external hard drive. The hard drive is labeled with his name "Mike".

31. An external hard drive (Model Number WL3000GSA6472) with the label "Mike" taped on the outside was recovered during the search warrant. The hard drive has a 3 terabyte (TB) capacity. Det. Conway conducted a preview of the contents of the hard drive at the scene and observed folders in the path of "Mike's Documents, Dad's Stuff, zzzz, Pictures." Within that folder Det. Conway observed child pornography images with names indicative of child

pornography, such as "7yo and 8yo Child porn" and "PTHC"[3]. Det. Conway observed at least fifty depictions of child pornography.

32.     At this point, SCHMEER was placed under arrest for Conn. Gen. Stat. § 53-196d, Possession of Child Pornography in the First Degree and was transported to the Waterbury Police Department.  Following his arrest, SCHMEER agreed to be interviewed by Det. Velez, who read him his constitutional rights.  The interview was recorded. Your affiant watched the video recording.

33.     SCHMEER advised that he started viewing child pornography approximately one to two years ago.  SCHMEER explained that he used to look at "regular porn" on the internet and that those sites have "teen categories."  SCHMEER admitted that "it's obviously wrong" and "it was stupid."  He went on to say that he never solicited child pornography and that it was not predatory, but personal for him.  SCHMEER knew that it was wrong but still did it.

34.     SCHMEER admitted to using torrent sites to download child pornography.  While using the torrent sites, SCHMEER used key words such as "preteen" to search for child pornography.  SCHMEER recalled that the child victims were "pretty young," ranging from 9 to 11 years of age, but that there was also 3 to 6 years of age.  SCHMEER did not share the child pornography with anyone.

35.     During his interview, SCHMEER told Detective Velez that there were additional hard drives inside a box on top of a desktop computer that was located on top of a work bench in the cellar.  SCHMEER told him that there were approximately 3 or 4 hard drives.  SCHMEER explained that he moved the child pornography from those drives to his new laptop; however, it

---

3 Based on my training and experience, I know "PTHC" is commonly used to refer to PreTeen Hard Core.

was possible that there might still be child pornography contained in the hard drives. SCHMEER explained that one or two of the hard drives did not work.

36. After SCHMEER advised about the additional hard drives, at approximately 0935 hours, Det. Conway and Det. Velez returned to SCHMEER's residence and spoke with his wife, who provided written consent to collect four hard drives which were on a work bench in the cellar. Those hard drives are included in the list of TARGET DEVICES above and are more specifically identified as:

a. **Target Device 11;**

b. **Target Device 12;**

c. **Target Device 13; and**

d. **Target Device 14.**

37. On September 22, 2020, the FBI opened an investigation into SCHMEER after learning that SCHMEER works for DRS Naval Power Systems, Inc. ("DRS NPS"), a wholly-owned subsidiary of Leonardo DRS, Inc., performing under contracts to support essential services required to meet national security requirements to the federal government and U.S. Department of Defense. Waterbury Police Department requested assistance from the FBI because they lacked the technical capability to store the data from the seized TARGET DEVICES. The volume of the data was greater than what they would have been able to store and/or view.

38. The TARGET DEVICES have not been forensically examined by the State of Connecticut Forensic Lab for analysis. The TARGET DEVICES are presently in the custody of the Waterbury Police Department in Waterbury, Connecticut.

**<u>BACKGROUND ON CELL PHONES AND TABLET DEVICES</u>**

39. Based on my knowledge, training and experience, I am aware that a mobile or a

cellular telephone, commonly referred to as a cell phone, and tablet devices, are handheld wireless devices used for voice and data communication through radio signals. A cell phone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cell phones and tablets offer a broad range of other capabilities. These capabilities include: running software or applications; storing contact names and phone numbers in electronic address books, commonly referred to as a cell phone user's contacts; sending, receiving and storing text messages and e-mail; taking, sending, receiving and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones and tablets may also include geo-location and global positioning system ("GPS") technology for determining the location of the device.

40.     Based on my knowledge, training, and experience, I know that computer hard drives, cell phones, tablets, and data storage devices (such as thumb drives, SD cards, flash drives, USB drives, CDs, and DVDs) (all collectively referred to herein as "computers and data storage devices"), can store information, pictures and videos for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools. Computers and data storage devices can store the equivalent of thousands of pages of information.

41.     Based on my training and experience, I know that evidence on computers and data storage devices can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

42.     A person with appropriate familiarity with how computers and data storage devices

work may, after examining this forensic evidence in its proper context, be able to draw conclusions about how computers and data storage devices were used, the purpose of their use, who used the devices, and when.

43. The process of identifying the exact electronically stored information on computers and data storage devices that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or data storage device is evidence may depend on other information stored on the device and the application of knowledge about how that device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

44. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

45. Based upon my training and experience, I know that when a digital camera or computer webcam is used to take a photograph or video, the device will often store information beyond the photograph itself. This "meta data" can include, the size of the file, its location on the device, the time and date of the photograph or video, GPS coordinates for where the photograph or video was taken, whether and when it has been accessed or modified, what device took the photograph or video, and other properties or data regarding the photograph or video.

**FORENSIC ANALYSIS OF COMPUTERS AND DATA STORAGE DEVICES**

46. The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying the file directories and any

individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); conducting a file by file review of the data; examining all the structured, unstructured, deleted, and free space data on a particular piece of media; opening or reading the first few pages of each file in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

47. Digital files or remnants of such files can be recovered months or even years after they have been downloaded or copied onto computers and data storage devices, deleted, or simply viewed via the Internet. Electronic files downloaded or copied onto computers and data storage devices can be stored for years at little to no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file, the data contained in the file does not actually disappear; rather, that data remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

48. In addition, a device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of space devoted to these files, and the files are only overwritten as they

are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and habits. As noted, it is not at all uncommon to recover files deleted months or years before.

49. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CHILD PORNOGRAPHY PRODUCER AND COLLECTOR CHARACTERISTICS**

51. Based upon my training and experience, as well as from information provided to me by other law enforcement personnel involved in the investigation of cases involving the sexual exploitation of children, I believe the following traits and characteristics are generally found to exist and be true in cases involving individuals who produce and/or collect child pornography:

a. Individuals who view child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. Individuals who view child pornography also view and/or collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video

tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.

    c.  Individuals who view child pornography often seek out like minded individuals, either in person or over the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to: P2P, e-mail, e-mail groups, bulletin boards, Internet Relay Chat ("IRC"), newsgroups, instant messaging, and other similar vehicles.

    d.  Individuals who view child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in private and secure locations such as their homes or on electronic storage devices, and they frequently create copies of their collections on one or more other electronic storage devices.

## CONCLUSION

52.  Based on my training and experience, I believe that any and all data that was on the TARGET DEVICES at the time the Waterbury Police Department seized them would still be on the TARGET DEVICES as the devices have remained in law enforcement's custody since seizure.

53.  Based on the aforementioned factual information, I believe there is probable cause to believe that the TARGET DEVICES, as more fully described in Attachment A to this affidavit, contain contraband, fruits, instrumentalities and evidence of the TARGET OFFENSES, or material otherwise criminally possessed, or property that is or has been used as the means of committing the TARGET OFFENSES.

54. In consideration of the foregoing, I respectfully request that this Court issue an order authorizing the search and seizure of the contents of the TARGET DEVICES, as more fully described in Attachment A, for the items, materials and records more specifically identified in Attachment B.

________________________________

Special Agent Anabela Sharp
Federal Bureau of Investigation

The truth of the foregoing affidavit has been attested to me by Special Agent Anabela Sharp over the telephone on this 24th day of November, 2020, at New Haven, Connecticut.

______________________________________

HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

The property to be searched are the following electronic devices (each a "TARGET DEVICE" and together the "TARGET DEVICES"), which the Waterbury Police Department seized on or about August 12, 2020 from the residence of Michael Schmeer, and which are presently located at the Waterbury Police Department in Waterbury, Connecticut:

a. One Dell Latitude E5450 S/N: 9SZGS32, ("**Target Device 1**");

b. One 3TB SATA III, Model: WL3000GSA6472, ("**Target Device 2**");

c. One Seagate Desktop HDD, S/N: 24Z6H1MS, ("**Target Device 3**");

d. One Acer Aspire Laptop E15 S/N: NXGRYAA0019070E0087600, ("**Target Device 4**");

e. One M11H Model Tablet with red case, ("**Target Device 5**");

f. Four USB Drives and one DVD-R hand written label "Legacy of Love" , ("**Target Device 6**");

g. One Seagate Barracuda 1000GB, S/N: W1D49AEC, ("**Target Device 7**");

h. One Seagate Pipeline HD 500 GB, S/N: 6VV8ZHOY, ("**Target Device 8**");

i. One Hitachi 2TB, S/N: YAK00095V, ("**Target Device 9**");

j. One WD VelociRaptor 150 GB, S/N: WXL1C10C9382, ("**Target Device 10**");

k. One Seagate drive S/N: 4NF1Y8LT, ("**Target Device 11**");

l. One Western Digital S/N: WMAM9CWS7022, ("**Target Device 12**");

m. One Seagate drive S/N: 3J82LTZN, ("**Target Device 13**");

n. One Seagate drive S/N: 5JS2R077, ("**Target Device 14**");

**ATTACHMENT B**

Property to be seized and searched

1. All records on the TARGET DEVICES described in Attachment A that relate to violations of Title 18, United States Code, Sections 2252A(a)(2) and 2252A(a)(5)(B) relating to the receipt and distribution and possession of visual depictions of minors engaging in sexually explicit conduct and child pornography, (the "TARGET OFFENSES"):

    a) Child pornography;

    b) Child erotica and evidence of access to children;

    c) Information, correspondence, records, documents or other materials constituting evidence of or pertaining to child pornography, child erotica, or access to children; or constituting evidence of or pertaining to the possession or receipt of child pornography, child erotica, or visual depictions of minors engaged in sexually explicit conduct; or constituting evidence of or pertaining to an interest in child pornography or sexual activity with children;

    d) Records or documents evidencing occupancy or ownership of the TARGET DEVICES, including utility and telephone bills, email or addressed correspondence;

    e) Evidence of who used, owned, or controlled the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    f) Evidence of software that would allow others to control the TARGET DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    g) Evidence of the lack of such malicious software;

    h) Evidence of the attachment to the TARGET DEVICES of other storage devices or similar containers for electronic evidence;

    i) Records of or information about Internet Protocol addresses used by the TARGET DEVICES;

    j) Records of or information about the TARGET DEVICES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).